UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DENNIS DONAHUE, 08-B-2160,

                   Petitioner,

         -vs-

PATRICK GRIFFIN,

                 Respondent.
_____

                                12-CV-0752-MJR
                                **Decision and Order**

## Introduction

*Pro se* petitioner Dennis Donahue ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his conviction in Erie County Court (Hon. Shelia DiTullio) of second degree murder.

The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c) (Dkt. #15).

The factual summary that follows derives from the parties' representations contained in the following submissions: Petition dated August 9, 2012 ("Pet." [Dkt. #1]), Respondent's Memorandum of Law in Opposition ("Resp't Mem." [Dkt. #12]), and attached exhibits ("Resp't Ex. __") and the trial transcripts ("T.__").[1] The Court has also considered the points raised in Petitioner's Reply Affirmation ("Pet'r Reply" [Dkt. #13]).

## Factual Background and Procedural History

Petitioner was convicted of Murder in the Second Degree, N.Y. Penal L. § 125.25[1] following a jury trial and was sentenced to a term of 25 years to life. He is currently incarcerated at Sullivan Correctional Facility.

_____

[1] Other proceedings are cited accordingly without further explanation.

Petitioner's conviction arises out of the strangulation death of Joan Giambra ("Giambra" or "the victim") on September 9, 1993 in the City of Buffalo. The victim's nude body was found on a sofa bed in her living room with her eleven year-old daughter lying on top of her in the fetal position, nude and unconscious. Years went by without an arrest, until September, 2007, when the Buffalo Police Department's "Cold Case Squad" secured DNA from Petitioner that matched DNA at the crime scene at the victim's house.

Around the same time, Petitioner's DNA was linked to the crime scene of another murder case implicating Lynn DeJac ("DeJac"). DeJac spent over a decade in prison for a crime she did not commit, i.e., the strangulation of her thirteen year-old daughter Crystallyn Girard ("Girard"), and was exculpated by DNA evidence also procured by the Cold Case Squad. The DNA found on Girard's body, on her bedding, and in a smear of blood on the bedroom wall, belonged to Petitioner.[2]

DeJac's conviction was vacated on November 28, 2007, by the Honorable Michael D'Amico, New York State Supreme Court Justice. DeJac's new trial was scheduled to begin two weeks after Petitioner's trial in the Giambra case.

Several pretrial hearings were conducted in Petitioner's case in late 2007 and early 2008, including suppression, dismissal, recusal, and preclusion motions. A jury trial commenced on April 21, 2008, and concluded May 12, 2008, following which Petitioner was convicted as charged.

---

[2] Thirteen-year-old Girard was found dead in her South Buffalo home on Valentine's Day, 1993. Her mother, DeJac, was accused of strangling the young girl after a night of drinking. DeJac was eventually tried and convicted of second-degree murder in Erie County court; she was sentenced to 25 years to life imprisonment. Petitioner, a one-time boyfriend of DeJac, saw her on the night in question. Though once a potential suspect in Girard's murder, Petitioner passed a polygraph examination and by virtue of his grand jury testimony implicating DeJac, he received immunity from prosecution.

On February 10, 2011, the Appellate Division, Fourth Department, unanimously affirmed the judgment of conviction, and the New York Court of Appeals subsequently denied Petitioner's application to review that determination. *People v. Donahue*, 81 A.D.3d 1348 (4th Dept.); *lv. denied*, 16 N.Y.3d 894 (2011).

Petitioner did not file any post-conviction motions.

Petitioner then filed the instant Petition for writ of habeas corpus in this Court on August 9, 2012, alleging the following twelve grounds, which he also raised on direct appeal: (1) the trial court's denial of a stay of proceedings, adjournment, and mistrial due to pretrial publicity concerns deprived Petitioner of a fair trial; (2) the trial court's denial of a challenge for cause deprived Petitioner of an impartial jury; (3) the 14-year delay between the crime and the indictment violated Petitioner's due process rights; (4) the prosecution's discriminatory exercise of three male preemptory challenges violated the *Batson* rule; (5) the verdict was against the weight of the evidence and the evidence was legally insufficient to sustain the conviction; (6) the trial court failed to comply with N.Y. Crim. Proc. L. § 310.30 with respect to a jury note; (7) the jury rendered a second verdict before having heard a requested read-back of DNA testimony in violation of Article 310 of N.Y. Crim. Proc. L.; (8) the admission of the victim's autopsy report deprived Petitioner of his right to confront witnesses against him; (9) trial counsel was constitutionally ineffective; (10) Petitioner was subjected to custodial interrogation without *Miranda* warnings; (11) the testimony of an inmate regarding Petitioner's confession was elicited by the prosecution in violation of Petitioner's right to counsel; and (12) the sentence was unduly harsh and excessive. Pet., Attach. at 1-20.

Respondent argues that Petitioner is not entitled to habeas relief because his claims are either procedurally barred, without merit, or do not present a question of constitutional dimension. Resp't Mem. at 3-52. [3] For the reasons that follow, the Petition is denied.

## Discussion

### I.    General Legal Principles

### A.    Standard of Review

A district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Errors of state law are thus not subject to federal habeas review. *E.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Federal habeas review of state court decisions is governed by the standard set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, which provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

[3] Respondent's Memorandum point headings do not correspond with the Petition in the instant matter, but closely resembles its state court appellate brief, which is correspondingly numbered to Petitioner's appellate brief. The Petition is the operative pleading in these proceedings and the Court therefore addresses Petitioner's arguments in the chronology advanced therein.

on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1), (2).

A state court decision is "contrary to" established federal law if the state court arrives at a conclusion on a question of law that is opposite to that reached by the Supreme Court, or if the state court adjudicates essentially the same facts as a prior Supreme Court case but reaches an opposite result. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (citations omitted). A state court decision is an "unreasonable application" of established federal law if (1) the state court correctly identifies the relevant legal principle but unreasonably applies it to a set of facts; (2) the state court unreasonably extends an existing principle to a new context where it should not apply; or (3) the state court refuses to extend an existing principle to a context where it should be extended. *Williams*, 529 U.S. at 407.  Any factual determination made by the state court must is presumed correct unless the habeas petitioner can rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

### B.    Exhaustion Requirement and Procedural Bar

It is well-settled that a federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). In order to exhaust a federal constitutional claim for the purposes of federal habeas review, the substance of the federal claim, both legal and factual, must be apparent from the petitioner's presentation to the state court. *See Picard*, 404 U.S. at 275–76; *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981). "The claim presented to the state court, in other words, must be the 'substantial equivalent' of

the claim raised in the federal habeas petition." *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir. 2003) (quoting *Strogov v. Att'y Gen. of N.Y.*, 191 F.3d 188, 191 (2d Cir. 1999) (in turn quoting *Picard*, 404 U.S. at 278 (1971)). Generally, this involves the completion of one full round of appellate review, meaning that the highest state court so empowered must have been presented with the opportunity to consider the petitioner's federal constitutional claim. *See Picard*, 404 U.S. at 275–76.

However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'" *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263, n. 9 (1989) (other citations omitted). Under such circumstances, a habeas petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. Section 2254(b)." *Id.* When a petitioner no longer has "remedies available" in the state courts, because he is procedurally barred by state law from raising such claims, the habeas court may deem the claims exhausted but procedurally defaulted. *Id.* at 120–21 (quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

The procedural bar that gives rise to the finding that the claim should be deemed exhausted works a forfeiture and precludes litigation of the merits of the claim absent a showing of cause for the procedural default and prejudice resulting therefrom or by demonstrating that the failure to consider the claim will result in a fundamental miscarriage of justice (i.e., actual innocence). *See Wainwright v. Sykes*, 433 U.S. 72, 87–91(1977); *see also Sawyer v. Whitley*, 505 U.S. 333 (1992).

### III.     The Instant Petition

####   A.     Ground One: Pretrial Publicity

Petitioner first alleges that he was denied a fair trial due to trial court's denial of his requests for a stay of the proceedings to re-apply to the Fourth Department for a change of venue, for an adjournment due to excessive media coverage, and for a mistrial. Pet., Attach. at 1-2.

Pursuant to New York Crim. Proc. L. § 230.20(2), Petitioner made a motion to the Appellate Division, Fourth Department, to change venue on the basis that a fair and impartial trial could not be had in Erie County. In support thereof, Petitioner attached 118 pages of media accounts between September, 2007, and January, 2008, many of which branded Petitioner a "possible serial killer," and identified him as a person of interest in the murders of Girard and a woman named Carol Reed who was found strangled in a Buffalo apartment in 1975.[4] Resp't Ex. A. The media accounts consisted of local and national news articles, televised reports, press conferences, and a two-hour interview with Lynn DeJac which either referenced or directly implicated Donahue's role in the murders of Carol Reed, Girard, and Giambra. Resp't Ex. A (Mot. to Change Venue [1/25/08]). The Giambra case was also slated to be featured on America's Most Wanted. *Id.*

On February 26, 2008, the Appellate Division denied Petitioner's motion, noting that it would re-consider the issue if it developed during *voir dire* that an impartial trial could not be had in Erie County. *See* Mot. Hr'g. (4/14/08) at 6.   As detailed below, Petitioner then unsuccessfully moved for a stay of proceedings to re-apply for a change

---

[4] Carol Reed lived in the same apartment building as Petitioner, and was killed on September 9, 1975, the same calendar date as Giambra's murder and Petitioner's birthday. Her murder remains unsolved.

of venue three times and, alternatively, for a mistrial, three times, on the basis of pretrial publicity.

The media coverage continued into April of 2008. Jury selection began on April 21, 2008, during which the trial court advised the prospective jurors that the case had received a "great deal of publicity," and to "put aside anything you may have read or heard about this case and base your verdict solely on the evidence presented in the courtroom." *See* Jury Selection Tr. ("J.S.") 2.  It further admonished them that forming an opinion about Petitioner's guilt or innocence "based on pretrial publicity, media accounts, et cetera, or discussions with others outside the courtroom disqualifies one from jury service." *Id.* at 12.

Jury selection continued for four days. During that time, three panels of prospective jurors were questioned. With respect to the first panel, 10 of 18 prospective jurors indicated that they had "heard, watched, or read about" the case. One juror acknowledged that he "did follow the DeJac case quite religiously," and another knew that "Ms. DeJac blamed [Donahue] from the beginning." A few were aware of Petitioner's testimony in DeJac's trial and his receipt of immunity in that case. All but one, who was ultimately dismissed, indicated that they could base their decisions solely on the facts presented. J.S. 184-96, 248.

In the second panel, five prospective jurors had read or heard about the case, one of whom indicated that "hearing about the DeJac case would be difficult," and that he could not be fair and impartial. He was excused by consent. J.S. 290-94.

On April 24, prior to *voir dire* of the second panel, defense counsel moved for a mistrial on the basis that Channel 2, a local television station, was scheduled to begin a

two-part series with an interview of DeJac, in which DeJac referred to Petitioner as a pedophile and a murderer.[5] J.S. 388-93, 400-03. In denying Petitioner's mistrial motion as premature, the trial court acknowledged the "tremendous amount of publicity," but noted that jury selection had only been ongoing for a day and a half and at least a majority of the jury panel of 18 indicated that they could be fair and impartial. The court advised that it would caution the jury not to watch any media over the next three days and throughout the trial, which it did, and further stated that jurors were to inform the court if they believed they could not be fair or impartial. J.S. 405-06, 414.

Defense counsel then requested a stay of proceedings from the trial court to allow him to re-apply to the Fourth Department for a change of venue on the basis that, out of 36 prospective jurors, 30 had knowledge of the DeJac case. J.S. 524. The trial court denied Petitioner's motion, citing the Appellate Division's previous decision to allow jury selection to proceed in the lower court, and further noted that jury selection had been in progress for less than two days, with eight jurors selected. J.S. 528.

Counsel later made a second request for a stay of the proceedings so he could re-apply to the Fourth Department for a change of venue in light of the upcoming television special on Channel 2, and on the basis that approximately 15 jurors had been recused because of the media coverage during the last round of questioning. J.S. 643. Petitioner's motion was again denied.

On April 25, 2008, day four of jury selection, defense counsel again renewed his motion for a mistrial and, in the alternative, for an adjournment to re-apply for a change

---

[5]  Approximately two months after DeJac's conviction was vacated, the then-District Attorney revealed that a new medical examination of Girard's body performed by two independent medical examiners indicated that the cause of Girard's death was not strangulation, but acute cocaine intoxication and was therefore "non-homicidal." As a result, the People dismissed the prosecution against DeJac and her second trial never took place. J.S. 395.

of venue on the basis of the "catastrophic media [coverage] that has taken place within the last 48 hours." J.S. 650. The previous night, Channel 2 aired a 13-minute story about the DeJac case, which referenced Petitioner. The prosecutor opposed Petitioner's motion on the basis that the focus of the news story was on DeJac, and that Petitioner had only been mentioned two times during the broadcast. J.S. 663. Petitioner's motion was denied. J.S. 674-75.

Questioning of the third panel continued, and another juror was excused by consent after indicating he had a "medium amount" of contact with the "original" Giambra case, "going back in years." J.S. 729, 774. At the conclusion of *voir dire* of the third panel, 11 jurors had been sworn. J.S. 796.

The fourth panel was questioned, after which three prospective jurors were removed by consent based on pretrial publicity concerns.

On the morning of April 28, 2008, Defense counsel made another mistrial motion, which was again denied. J.S. 938. The trial court noted that if it were to grant Petitioner's request for a stay until the publicity subsided, it would likely pick up again whenever the trial resumed. J.S. 939. At that time, the 11 sworn jurors were questioned by the trial court as to whether they had been exposed to media information; all indicated in the negative. J.S. 947. Later in the day, four more jurors, including three alternates, were sworn. T. 1052.

On direct appeal from Petitioner's conviction, the Fourth Department found that the trial court "properly determined that the prospective jurors' exposure to news accounts did not warrant a mistrial or an adjournment, nor did such exposure warrant a

stay of proceedings to enable defense counsel to move again for a change of venue."
*Donahue*, 81 A.D.3d at 1349.

A criminal defendant has the right to a trial before "a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). However, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799–800 (1975). The Supreme Court has set aside state convictions based on publicity surrounding the trial where the trial was conducted in a "carnival atmosphere," *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966), or dominated by a "wave of public passion." *Irvin*, 366 U.S. at 728. In determining whether a trial was not fundamentally fair, courts must consider the "totality of the circumstances." *Murphy*, 421 U.S. at 799. Furthermore, the state court's finding that the jury was impartial is entitled to a "presumption of correctness," and "'the trial court's findings of impartiality [may] be overturned only for manifest error.'" *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)).

As this Circuit pointed out in *Knapp*, "[j]ury bias can be established only if a habeas petitioner demonstrates that "prejudice [wa]s 'manifest.'" 46 F.3d at 176 (quoting *Irvin*, 366 U.S. at 724). "That is, the petitioner must show the 'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.* (quoting quoting *Irvin*, 366 U.S. at 723) (internal quotations omitted).

It is true that there was much publicity surrounding Girard's murder and DeJac's exoneration, which in turn incriminated Petitioner. The record shows that the media accounts ran from November, 2007, through the beginning of Petitioner's trial and contemporaneously with the jury selection process. Although the media coverage

focused on Girard and DeJac, DeJac directly implicated Petitioner in the murder of Girard. The media accounts also revealed that Petitioner's DNA had been found on or near Girard's body, and that Petitioner had received grand jury immunity in DeJac's prosecution and therefore could never be prosecuted for Girard's murder. Girard's death was initially attributed to murder by strangulation, much like Giambra's, but a press conference on February 13, 2008, announced that Girard's death was determined to be non-homicidal as a result of an accidental cocaine overdose, technically removing Petitioner's role in her death.

Although numerous newspaper articles, television specials, interviews, and national media attention relating to DeJac's exoneration occurred in such close proximity to jury selection in Petitioner's case, the record does not establish that the publicity was so "widespread and inflammatory" so as to prejudice the inhabitants of the community in which Petitioner was tried. *Irvin*, 366 U.S. at 719–21.  In *Irvin*, "the pattern of deep and bitter prejudice shown to be present throughout the community was clearly reflected" by the fact that 8 of the 12 jurors actually selected admitted to a preconception that the defendant was guilty. *Id.* at 727. The Supreme Court held that the trial-court's finding of impartiality after the *voir dire* examination of the selected jurors did not meet constitutional standards where "[t]wo-thirds of the jurors had an opinion that [the defendant] was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief." *Id.* at 727–28 (citation omitted).

Jury selection for Petitioner's trial was commenced with cautionary instructions to the prospective jurors concerning the need to disregard pretrial publicity. J.S. 2, 11. After several rounds of questioning by the court and counsel, jurors that expressed that the media coverage *could* or *might* affect their judgment were removed. The vast majority of prospective jurors who were questioned about the effect of the pretrial publicity responded either that they had minimal knowledge of the Giambra murder for which Petitioner was currently on trial, or stated that they could be fair and impartial in light of media surrounding DeJac's exoneration. The trial court admonished the venire to ignore the current publicity mentioning Petitioner. Petitioner was also afforded additional peremptory challenges, and more cautionary instructions were given by the trial court between each panel's questioning.

After three days of jury selection (which included various motion hearings), 11 jurors were sworn from four panels. Approximately 15 to 20 potential jurors from the four panels were excused on the basis of the publicity, which "may indeed be . . .  more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Murphy*, 421 U.S. at 803 (20 of 78 persons excused because they expressed an opinion as to defendant's guilt). Thus, most of the 126 total jurors excused by consent were excused for reasons unrelated to the media coverage.

Petitioner does not cite any evidence of actual prejudice to support his contention, *see Murphy*, 421 U.S. at 800 (defendant must show actual existence of prejudice to overcome juror's assurances of impartiality), and the record of the jury

selection proceedings does not support the conclusion that the pretrial publicity rendered it impossible to select impartial jurors in Erie County. In making this assessment, the Court is mindful that "in the era of modern communications, it is nearly impossible to find a juror who has not been exposed to *some* measure of information regarding a highly publicized case . . . . " *Knapp*, 46 F.3d at 176 (emphasis added). Transfer was not warranted simply because some of the jurors had preexisting knowledge of the facts of the DeJac case, or even because they may have formed an opinion about the Giambra case. Rather, the actual jury pool as a whole did not demonstrate a bias against Petitioner, and a jury was able to be selected in a relatively brief period of time given that much of the jury selection proceedings had been interrupted by motion argument. Indeed, the Second Circuit has rejected claims that the venire was not sufficiently impartial where the pretrial publicity was more substantial. *See, e.g.*, *Knapp*, 46 F.3d at 176 (finding no manifest error in state court's determination that jury was impartial when defendant argued that 83% of veniremen were excused because they had prejudged the case); *see also United States v. Higgs*, 353 F.3d 281, 308–09 (4th Cir. 2003) (affirming denial of motion to transfer venue in which majority of potential jurors had heard about the case and several stated that they had formed an opinion based on publicity).

In light of these circumstances, it cannot be said that the trial court committed "manifest error" in finding that the jury as a whole was impartial, and there is no evidence on the record to overcome the presumption of correctness as to the trial court's finding that jurors would be impartial. Ground One of the Petition is therefore dismissed.

**C.     Ground Two: Denial of For-Cause Challenge**

Petitioner next argues that a prospective juror should have been removed for cause because she failed to provide an unequivocal assurance that she would accept the principle that the burden of proof rests solely with the prosecution. Pet., Attach. at 3-4. Specifically, Petitioner contends that he was forced to exhaust his extra peremptory challenges to remove from the venire the prospective juror he considered biased, in violation of his constitutional right to a fair trial and impartial jury. *Id.*

On appeal, the Fourth Department found,

> Defendant failed to preserve for our review his contention that the court erred in denying his challenge for cause to a prospective juror based on the alleged failure of the prospective juror to understand the burden of proof . . . .  In any event, "[a]ny alleged error on County Court's part was cured when defendant was granted two extra peremptory challenges during a meaningful point in the jury selection process," thus enabling defendant to exercise a peremptory challenge with respect to that prospective juror.

*Donahue*, 81 A.D.3d at 1349 (quoting *People v. Miles*, 55 A.D.3d 955, 955 (3d Dep't 2008), *lv. denied* 11 N.Y.3d 928 (2009); other citations omitted).[6]

The Sixth Amendment grants a criminal defendant the right to a trial "by an impartial jury." *See* U.S. Const. Amend. VI. "The right to an 'impartial jury' is also grounded on principles of due process." *United States v. Barnes*, 604 F.2d 121, 169 (2d Cir. 1979). It includes "the right to take reasonable steps designed to insure that the jury is impartial" and one of the most important devices for doing so is the jury challenge, of

---

[6] The Court views the Fourth Department's determination as an adjudication on the merits. *See Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004) (finding that the state court rendered an adjudication on the merits when it held the "petitioner's claim to be unpreserved, and in any event, without merit").

which there are two types: "'for cause,' where actual bias is admitted or presumed" and "'peremptory,' where bias is suspected or inferred." *Id.* The Supreme Court has made clear that "peremptory challenges are not of constitutional dimension" and their loss does not constitute "a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* Moreover, "[i]t is within the trial court's discretion whether to grant or deny a challenge for cause and a denial of such a challenge will not support a petition for habeas corpus relief unless the asserted disqualifying fact was so prejudicial that the refusal deprived the defendant of a fundamentally fair trial." *Stone v. Stinson*, 121 F. Supp. 2d 226, 239 (W.D.N.Y. 2000) (citing *Duran v. Keane*, No. 95-CV-290, 1997 WL 204312, *2 (N.D.N.Y. Apr. 15, 1997)).

Prospective Juror #7, upon questioning regarding the burden of proof, stated that while she would not "require" Petitioner to raise a defense, "logically, you would have something to offer." J.S. 238. She went on to state that she would not "hold it against" Petitioner if he did not offer any evidence, and explained that as a logical person, it would make sense that counsel "would maybe account for the man's whereabouts during that time," and that she "might" have some issue with the fact that the burden of proof was on the prosecution. *Id.* at 238-39. Defense counsel exercised a challenge for cause for reasons different than proffered here (including, *inter alia*, media attention, the juror's employment with Erie County, and prejudging Petitioner), which was denied by the trial court as the juror stated that she could be fair and impartial. J.S. 253.

After being denied his challenge for cause, defense counsel peremptorily challenged Juror #7 to remove her from the venire. "Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Ross*, 487 U.S. at 89 (internal citations omitted). Petitioner was provided with the statutorily permitted peremptory challenges, as well as two additional challenges granted by the trial court in an exercise of caution. J.S. 744, 783, 1040;  *see e.g., Parker v. Phillips*, 717 F. Supp. 2d 310 (W.D.N.Y. 2010) (defendant's alleged loss of peremptory challenge resulting from trial court's denial of challenge for cause did not deprive defendant of his Sixth Amendment or due process rights, since peremptory challenges were not of constitutional dimension). Moreover, Petitioner does not now claim that any juror who served on the jury that convicted him was partial on the basis of the burden of proof, because the juror whose bias was challenged ultimately did not serve on the jury. *See Cruz v. Jordan*, 357 F.3d 269, 271 (2d Cir. 2004) ("[T]he Supreme Court has made clear, at least in the criminal context, that a party's use of a peremptory strike to cure a court's erroneous failure to dismiss a juror 'for cause' effects neither a constitutional nor a rule-based deprivation, as long as the jury eventually empaneled is impartial.").

Accordingly, Petitioner's claim that the trial court should have granted his peremptory challenge as to Juror #7 is not a proper ground for habeas relief and this claim is dismissed.

## C.      Ground Three: Pre-Indictment Delay

Petitioner next contends that the 14-year delay between the date of the crime and his indictment denied him his rights to a fair trial and due process. Pet., Attach. at 5-6. In support of his argument, he claims that the police were aware of Petitioner as early as 1993 and neglected to pursue him, and that two potential witnesses died prior to his indictment. *Id.* at 5.

On direct appeal, the Fourth Department applied the factors set forth in *People v. Taranovich*, 37 N.Y.2d 442, 445 (1975),[7] and rejected Petitioner's contention on the merits. *Donahue*, 81 A.D.3d at 1349-50.

 Following a pretrial *Singer* hearing,[8] the trial court found that the prosecution established good cause for the delay in charging Petitioner because he was not a person of interest until September 10, 2007, after which he was interviewed and a buccal swab was obtained on September 13, 2007. He was arrested and charged four days later on September 17, 2007 based on the results of the DNA analysis performed on the swab. *Singer* Hr'g. 5. The trial court found that, while the delay was lengthy, it was occasioned by a lack of evidence sufficient to charge Petitioner until September 2007, and there was nothing to suggest that the prosecution of Petitioner was delayed in any deliberate fashion. *Id.* at 6. Next, the trial court found that "due to the serious

---

[7] In determining whether a prosecution has been unduly delayed, a New York court will balance five factors: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay." *People v. Decker*, 13 N.Y.3d 12, 15 (2009) (quoting *Taranovich*, 37 N.Y.2d at 445). *Taranovich* addressed a post-arrest delay in prosecution, that is, it implicated speedy trial concerns. However, New York state courts apply this test to both pre-and post-arrest and indictment delays. *Id.*

[8] *See People v. Singer*, 44 N.Y.2d 241 (1978).

nature of the offense the police would be expected to proceed in a deliberate and cautious fashion rather than rush to charge someone against whom they had no evidence." *Id.* Petitioner was not incarcerated and was at liberty during the 14-year delay. Finally, the trial court rejected Petitioner's contention that his defense was prejudiced by the death of two individuals who might have been witnesses as unsupported by the record "inasmuch as the defendant fails to demonstrate how those persons would have been witnesses on his behalf and in what specific manner their unavailability impairs his defense." *Id.*

The Appellate Division agreed:

> Contrary to the contention of defendant, his constitutional right to due process was not violated by the 14-year delay between the death of the victim and the date on which he was indicted. . . . Here, the People established good cause for the delay by demonstrating that defendant was not a person of interest in the investigation before the year 2007. Indeed, they established that they lacked sufficient evidence to charge defendant until September 2007, at which time defendant agreed to provide a sample of his DNA and his DNA matched DNA samples taken from the victim's fingernails. . . . . Finally, we note that the underlying charge was murder in the second degree, inarguably a very serious offense . . . and that is another factor to consider in determining whether the preindictment delay was reasonable.

*Donahue*, 81 A.D.3d at 1349-50.

"[The] Due Process Clause . . . would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 32 (1971). Further, the Supreme Court stated that petitioners have limited protection under

the Due Process Clause when claiming that pre-indictment delay was oppressive, as they must show actual prejudice caused by the delay and that the delay was unreasonable and unnecessary. *United States v. Lovasco*, 431 U.S. 783, 789–90 (1977). The standard for demonstrating "actual prejudice" is fairly stringent, as "[t]he dimming of memories with the passage of time, without more, does not create actual substantial prejudice to the right to a fair trial which would warrant dismissal of a case for pre-indictment delay." *United States v. Harrison*, 764 F. Supp.  29, 32 (S.D.N.Y. 1991). "Proof of actual prejudice must be definite and specific." *United States v. Scala*, 388 F. Supp. 2d 396, 399 (S.D.N.Y.  2005) (citing *United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir.1982).

Petitioner's argument that the police's "lack of interest" caused the delay in his prosecution does not establish, much less allege, that the prosecution delayed indictment in a deliberate attempt to gain tactical advantage. *See Marion*, 404 U.S. at 324; *see also United States v. Cornielle*, 171 F.3d 748, 751–52 (2d Cir. 1999) (defendant bears a "heavy burden of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose) (emphasis added). Nor does it establish actual prejudice. *See United States v. Birney*, 686 F.2d 102, 105–106 (2d Cir. 1982) (proof of actual prejudice "must be definite and not speculative").

Petitioner himself acknowledges that although names from the Southside bar, where the victim frequented and where he was employed as a bartender, were in the police file, his name was not specifically mentioned. Pet., Attach. at 5-6. Rather, witnesses at the time simply referred to "a bartender" from the Southside that the victim

may have been dating and was fearful of. *Id.*; *see Singer* Hr'g. 21-22. Detectives testified that the file did contain information from patrons at the Southside bar including mention of a bartender that Giambra was afraid of, but that Petitioner did not become known to them by name until September 10, 2007, after which they immediately interviewed him and obtained a buccal swab for purposes of forensic DNA. *Id.* at 7, 21-22, 46. The state court's factual findings stemming from the *Singer* hearing can only be dismissed by clear and convincing evidence, which Petitioner does not proffer. *See* 28 U.S.C. 2254(e)(1).

Petitioner also speculates that two witnesses who since died could have provided testimony, but does not explain what that testimony would be or how it would have assisted in his defense. "In the context of unavailable witnesses, the defendant must offer some grounds for his belief that the absent witness would have helped his case in a material way." *United States v. Greer*, 956 F. Supp. 525, 528 (D. Vt. 1997) (internal quotation omitted). This is far from the definite proof of prejudice required to state a due process claim. *See United States v. Gotti*, No. S4 02 CR 743, 2004 WL 32858, at *3-4 (S.D.N.Y. Jan.6, 2004) (rejecting claim of actual prejudice due to unavailable witnesses).

Although he faults detectives' "lack of interest" in the case and claims that two witnesses who since died "could have" provided testimony, neither argument proves prejudice required to state a due process claim. Pet., Attach. at 5-6. Accordingly, the state courts' rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and this ground must be dismissed.

**D.      Ground Four: *Batson* Violation**

Petitioner contends, as he did on appeal, that the prosecutor exercised discriminatory peremptory challenges against three prospective male jurors on the basis of their gender. Pet., Attach. at 6-7.

On this issue, the Fourth Department held:

> We reject the contention of defendant that the court erred in denying his *Batson* challenge with respect to the prosecutor's use of peremptory challenges to three male prospective jurors. Defendant failed to present "facts and other relevant circumstances sufficient to raise an inference that the prosecution used its peremptory challenges" in a discriminatory manner (*People v Childress*, 81 NY2d 263, 266 [1993]; *see generally Batson v Kentucky*, 476 US 79, 93-94 [1986]).
>
> "Specifically, defense counsel did not compare the challenged jurors to similarly-situated unchallenged prospective jurors, point to factors in the challenged jurors' background that made them likely to be pro-prosecution, or enunciate any factor that suggested that the prosecutor exercised the challenges due to the prospective jurors' gender" (*People v MacShane*, 11 NY3d 841 [2008], 842; *see People v Hecker*, 15 NY3d 625, 648 [2010]).

*Donahue*, 81 A.D.3d at 1350.

The record reveals that at the conclusion of questioning of the third jury panel, the prosecutor exercised peremptory challenges against three prospective male jurors. J.S. 247-54. Defense counsel made a motion pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing that the prosecutor excused the three men "because they're males and . . . we've got a male defendant," and that a female juror was not excused. J.S. 254-55. He noted that one of the jurors repeatedly said he could be fair, and another appeared to give the prosecution the benefit of the doubt. *Id*. In response, the prosecutor erroneously argued that a white male was not a cognizable racial group for

purposes of *Batson*. *Id.*  The trial court summarily denied defense counsel's motion, ending the *Batson* analysis. J.S. 256.

In *Batson*, the Supreme Court held that, under the Equal Protection Clause, it is impermissible for a prosecutor to exercise peremptory challenges against potential jurors "solely on account of their race." 476 U.S. at 89. Indeed, it is a violation for a prosecutor to strike even a single juror with a discriminatory purpose. *See Walker v. Girdich*, 410 F.3d 120, 123 (2d Cir. 2005) ("[U]nder *Batson* and its progeny, striking even a single juror for a discriminatory purpose is unconstitutional.") Although *Batson* speaks to prohibiting racial discrimination, its progeny have extended the holding to barring peremptory challenges on the basis of ethnicity and gender. *See J.E.B. v. Alabama*, 511 U.S. 127, 128-29 (1994); *United States v. Martinez–Salazar*, 528 U.S. 304, 306, (2000) ("Under the Equal Protection Clause, a [party] may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race.").

Courts follow a three-step procedure to determine whether a prosecutor has used a peremptory strike to exclude jurors on the basis of gender. First, courts consider whether a defendant has established a "*prima facie* case" of discrimination "by showing that the totality of the relevant facts" supports an inference that the prosecutor acted with a "discriminatory purpose." *Batson*, 476 U.S. at 93–94. "Second, once the defendant has made out a *prima facie* case, the 'burden shifts to the [prosecutor] to explain adequately the . . . exclusion' by offering permissible [gender]-neutral justifications for the strikes." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712). Third, "[i]f a [gender]-neutral explanation is

tendered, . . . court[s] must then decide . . .  whether the opponent of the strike has proved purposeful . . . discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (*per curiam*). At issue here is the first step of the *Batson* analysis—whether Petitioner established a *prima facie* case of discrimination.

In order to make out a *prima facie Batson* claim of discriminatory peremptory challenges, a petitioner must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose," including, for example, a "pattern of strikes" against jurors of a certain gender or a "prosecutor's questions and statements during [the] *voir dire*." *Batson*, 476 U.S. at 94, 96–97. As the New York Court of Appeals observed in *People v. Childress*, 81 N.Y.2d 263, 268 (1993), trial counsel must "articulate and develop all of the grounds supporting the [*Batson*] claim, both factual and legal, during the colloquy in which the objection is raised and discussed." Where counsel states a perfunctory or "mild objection" to the exercise of peremptory challenges, but fails to develop all of the grounds supporting the objection, the *Batson* claim has been defaulted. *Holland v. Donnelly*, 216 F. Supp. 2d 227, 250 (S.D.N.Y. 2002). When a federal habeas court reviews a state court's decision that a defendant failed to establish a *prima facie* case of *Batson* discrimination, the court should only ask whether the state court determination was "contrary to, or involved an unreasonable application of, clearly established federal law." *Sorto v. Herbert*, 497 F.3d 163, 171 (2d Cir. 2007); *Carmichael v. Chappius*, No. 14CIV10012, 2016 WL 1611503, at *11 (S.D.N.Y. Apr. 21, 2016).

In the state court proceedings, defense counsel averred that the prosecutor had eliminated the three male jurors "because they're male" and because Petitioner was a

male, noting that one of the prospective jurors indicated he could be fair, and another appeared pro-prosecution in response to his questioning. J.S. 254-56. Counsel did not further develop the argument that there was no reason for the challenges other than gender, and otherwise failed to "address or call to the attention of the trial judge crucial information surrounding the statistics," such as the total makeup of the venire, the number of men who actually sat on the jury, and the number of men who were not challenged by the prosecutor. *Copeland v. Walker*, 258 F. Supp. 2d 105, 123 (E.D.N.Y. 2003) (internal citations omitted); *see also Overton v. Newton*, 295 F.3d 270, 279 (2d Cir. 2002) (petitioner has "burden of articulating and developing the factual and legal grounds supporting [the] *Batson* challenge before the trial court."); *Childress*, 81 N.Y.2d 263, 267–68 (assertion that jurors indicated no reason why they could not be fair was insufficient to establish a *prima facie* case on the record because it "served only to highlight that the stricken jurors demonstrated no biases that would disqualify them for service or support a challenge for cause.")

Moreover, Petitioner's *Batson* motion was made early in jury selection and was not renewed, with the final composition of the jury consisting of nine men and three women. The Second Circuit has held that when a *Batson* challenge is raised before *voir dire* is complete, it is not an unreasonable application of *Batson* for the trial court not to find a *prima facie* showing of discrimination. *See Sorto*, 497 F.3d at 174.

Accordingly, the Court finds that the state court did not unreasonably apply *Batson* with regard to the trial court's finding regarding the sufficiency of Petitioner's *prima facie* showing. Ground Four of the Petition is therefore dismissed.

**E.      Ground Five: Sufficiency and Weight of the Evidence**

Petitioner argues that the prosecution failed to prove that he intentionally caused the victim's death by strangulation because the DNA belonging to Petitioner found under Giambra's fingernails established casual contact and not a violent confrontation; there was no testimony placing Petitioner at the crime scene; and the testimony of jailhouse informant Julius Jackson was not credible. Pet., Attach. at 8-10.

The Appellate Division found that the evidence was legally sufficient to support the conviction and that the verdict was not against the weight of the evidence. *Donahue*, 81 A.D.3d at 1350.

1.    <u>Witness Testimony</u>

On the night of September 8, 1993, the victim's son, Don Cormier ("Cormier"), left work at 10:00pm and stopped to visit his mother and his sister Kathleen Giambra ("Kathleen") at their house on Hillside Avenue. T. 192-93. Cormier lived a few blocks away from Giambra's home in South Buffalo. *Id.* Cormier testified that his mother and her then-husband, Sam Giambra ("Sam"), had separated the previous month and Sam had moved out of the house. T. 191. When Cormier arrived, his mother was on the phone and his sister was getting ready for bed. They visited for about a half-hour, and he left sometime after 11:00pm. Cormier recalled that the sofa in the living room was not pulled out into a bed when he left. T. 194-95.

Kathleen, who was 11 years-old at the time of her mother's murder, also testified at Petitioner's trial. She recalled that her parents had separated at the end of the summer and her father, Sam, had moved to Cheektowaga, where she would visit him at

his apartment. T. 272, 275. On September 8, 1993, Sam picked up Kathleen from her first day of school in the 6th grade and dropped her off at home before his 4:00pm shift as a Metro Bus driver. T. 276-77. Kathleen recalled that during the evening, she watched television while her mother talked on the phone with relatives. Her brother stopped by after 10:00pm to show them some family photos, and left around 11:00pm. T. 278-79. Kathleen, dressed in a nightgown, kissed her mother goodnight and went to sleep in her mother's bedroom. She had no recollection of what happened afterward until she awoke in the hospital the next day with her nightgown missing. She recalled somebody telling her that her mother was no longer alive. T. 280-81. Kathleen spent a month and a half in the hospital with post-traumatic stress disorder. T. 281, 296.

Kathleen testified that over the years she could never remember what happened on the night of her mother's death, despite talking with police officers numerous times and undergoing hypnotism to help her recollection. T. 282. She stated that her father Sam had schizophrenia, for which he took medications "off and on." T. 272, 301. After Giambra's death, Kathleen testified that she spoke to her father about who killed her mother, and she believed that Sam did not commit the murder. T. 318. Kathleen went to live with her aunt in 1993, and Sam committed suicide in 2000. T. 271, 311.

Gary Kornowski met Giambra in August, 1993, and the two dated and had sexual relations. He testified that they did not engage in "rough sex," and the last time he spoke with the victim was on the phone on the night of her murder between 9:00 and 10:00pm. T. 883-84. They last had sexual contact a few days before she died. T. 885. In November, 2007, Gary Kornowski volunteered a DNA sample. T. 885-86.

First responders also testified at Petitioner's trial. Firefighter Michael Busshart was dispatched to the victim's Hillside Avenue home on the morning of September 9, 1993, and gained entry through an open window. He then unlocked the front door to allow other responders into the house. Once inside, he observed the nude body of a female on her back with a nude child in the fetal position beside her. The female was "cold to the touch" and the child was alive, but non-communicative. T. 241-45, 252-54.

Detective Charles Wilson of the Buffalo Police Evidence Unit arrived at the victim's house at 11:30am where he saw the nude body of a female on a convertible couch in the living room. T. 92-95. No doors, locks, or screens were broken, and there were no signs of a struggle. T. 125. Det. Wilson collected 19 items of evidence and bagged Giambra's hands to prevent contamination. T. 95, 108. At the morgue, he collected fingernail clippings from both hands. T. 104, 106.

Detective Carl Lipinsczyk also responded to the crime scene, and testified that Sam became a person of interest after the homicide and remained so until 1995, when Det. Lipinsczyk retired. T. 393. In 1995, there were no other suspects.

## 2.   Cold Case Squad and DNA Evidence

The City of Buffalo Police Department Cold Case Squad ("Squad") was formed in mid-March of 2006. Detective Charles Aronica was assigned to the Squad since its inception, along with Detectives Dennis Delano and Mary Gugliuzza. T. 657. The Squad re-opened the Giambra case in the end of March, 2006. Det. Aronica testified that he interviewed the victim's daughter, Kathleen, in March of 2006, during which he learned that Sam had died. After obtaining Sam's tissue samples from the morgue, he submitted them for DNA testing. Six months later, the DNA test results were returned, eliminating

Sam as a suspect. T. 659-60. After a lull in the case, Detective Lissa Redmond joined the Squad in June of 2007, who became lead investigator. T. 661, 657.

In September, 2007, Det. Aronica and Det. Redmond began looking for Petitioner after speaking with two of Giambra's relatives. T. 662. The two detectives located Petitioner in an apartment in Kenmore, New York, and advised him that his "name came up in the Joan Giambra case," to which Petitioner responded that he "didn't know her." T. 665. In an attempt to refresh Petitioner's recollection, Det. Aronica explained Giambra's murder, and that Petitioner's name came up in their investigation in that he was an acquaintance of the victim. Petitioner told the detectives that he knew the victim but did not know her last name; she was a customer at the Southside bar where he used to work, but she wasn't a regular customer. T. 666. According to Petitioner, she used to come in with an older woman that was a neighbor of hers. Petitioner also volunteered that he had gone on a date with Giambra, but had not seen her in a couple of months prior to her death and he heard about the murder from patrons in the bar. T. 667-68. When asked whether he had ever been to Giambra's home, Petitioner said he'd never been there, after which he consented to a buccal swab for DNA testing. T. 668. He then acknowledged a single encounter of oral sex with the victim in his car. T. 670.

On September 17, 2007, after receiving the results of Petitioner's DNA test, Detectives Aronica and Gugliuzza returned to Petitioner's house to request an interview. Petitioner accompanied the detectives to the police station and made a statement. Upon being shown a photograph of Giambra from the crime scene, Petitioner stated that he "never saw that lady before." T. 681. A second photograph of the victim, clipped from a newspaper, was acknowledged by Petitioner: "that's her." T. 683. Petitioner told the

detectives that he knew nothing about the incident, that he knew Giambra but "not well" from the Southside tavern where he used to tend bar, and Giambra would come in once or twice a week, but was not a regular and "not a big boozer." T' 688-89. He stated that they never went on a date but had one encounter of oral sex in his car, and that was his "one and only encounter with the woman besides serving her drinks," which happened a couple of months prior to her death. According to Petitioner, he lost interest in Giambra upon finding out that she was married. T. 691. He never had a fight with Giambra, had never been to her house, and did not even know where she lived. At the time, Petitioner was living in South Buffalo with a woman named Janet. T. 691. Finally, Petitioner told detectives that he could not remember his whereabouts on September 9, 1993. T. 694.

Det. Redmond testified to the same circumstances surrounding Petitioner's interview at his home, his comments regarding the victim and their physical contact, and his voluntary submission to a buccal swab. T. 571-582.

Forensic serologist Amanda Finbar performed Y-STR and autosomal DNA analysis on several items from the crime scene, including cigarette butts, a bed sheet, vaginal, rectal, oral, and pubic swabs, and fingernail clippings from the victim, generating nine reports. T. 983, 987. Petitioner could not be excluded from contributing to the genetic profile on two vaginal swabs, one pubic swab, and the fingernail clippings. T. 1049, 1053. Sam, Don Cormier, Gary Kornowski, and five other males that had contact with Giambra prior to her death were excluded as contributors to the genetic profile on all of the swabs. T. 1050-51, 1055. No other male genetic profile was present on the fingernail clippings. T. 1060. [9] Ms. Finnbar testified that she was unable to state

---

[9] The probability of randomly selecting an unrelated male to Petitioner with a matching DNA profile was one in 23.5 billion for the right hand fingernail clippings. *Id.*

when or how the DNA was deposited on Giambra, and that the source of DNA under the fingernails was likely skin, but could also have been sweat or saliva. T. 1079-80. Further, it was uncertain as to whether the DNA was extracted from the inside or the outside of the fingernail. T. 1211.

A medical investigator for the Erie County Medical Examiner's office testified as to the paraffin blocks, histology logs, and the pathological examination (autopsy) report relating to Giambra. T. 922-938.

A medical examiner from Rensselaer County, Dr. Michael Sikirica, reviewed Giambra's autopsy report and opined that her cause of death was asphyxia due to manual strangulation on the basis of fractures, hemorrhaging, and bruising throughout the neck and larynx. T. 1129. He further testified that a victim being squeezed around the neck with a full grip will lose consciousness after 12 to 15 seconds, and a struggle with the assailant could interrupt the amount of force, prolonging that amount of time. T. 1138. In order to cause the victim's death, an assailant must maintain pressure for several minutes. T. 1139. Dr. Sikirica concluded that moderate force was used to cause death, and that the foreign DNA under her nails was deposited at or around the time of her death, as DNA from the fingernails is not easily recovered because it tends to dislodge itself and can be destroyed by hand washing. T. 1140-44. The foreign DNA found in Giambra's fingernails was caused by a heavy scratch consistent with a struggle or a very rough sexual encounter. T. 1145. The amount of foreign DNA present was inconsistent with casual contact such as a "hug, caress, or massage." T. 1147.

Finally, a second forensic serologist testified that any unknown male DNA that was present at the crime scene, which was found in trace amounts, was likely due to

pre- or post-autopsy contamination. T. 1314. He further explained that, "assuming normal activity," DNA will be present under fingernails for "only a few hours." T. 1324. DNA "on top" of the nails would remain there even less time. T. 1325. He opined that Petitioner's DNA was deposited during strangulation, where the victim was "clawing at the assailant to remove hands from the neck." T. 1327.

### 3. Informant Julius Jackson

Julius Jackson ("Jackson") was an inmate at the Erie County Holding Center ("Holding Center") from August, 2007, to April, 2008, and testified at Petitioner's trial.[10] In January and February, 2008, Jackson and Petitioner were housed in the same unit. Petitioner, who is diabetic, was not permitted to have snack foods. The two had an "arrangement" where Petitioner would deposit money into Jackson's prison account so that Jackson could buy snacks for Petitioner at the commissary, and Petitioner would give Jackson a "couple dollars" in exchange for this service. T. 425.

Sometime between January 20 and January 22, 2008, Jackson was discussing his own case with some other inmates, explaining that he was not sure if he would plead guilty to a child molestation charge. According to Jackson, Petitioner interjected that he "wouldn't plead guilty to nothing like that." T. 428. In Jackson's case, the victim's mother reported the crime to police, and Petitioner told Jackson that "If it was him," he would "stop the daughter from going to the mother and the mother from going to the police. . . . " T. 430. Jackson then asked Petitioner if he "[did] that shit that you in here

---

[10] Following a *Cardona* hearing, the trial court found Jackson to be credible, that he acted on his own initiative by providing information without direction from law enforcement personnel, and that his testimony would be admissible at trial. *See People v. Cardona*, 41 N.Y.2d 333, 392 (1977) (New York state court proceeding to test whether a prosecution witness was acting as an agent of the prosecution when he or she spoke to the defendant in jail); *see Cardona* Hr'g. 3-41.

for," and Petitioner responded that "he had to." Jackson related that Petitioner "wasn't worried because he had a good lawyer . . . . and, you know, that the prosecution didn't have anything against him . . . ." *Id.*

In subsequent conversations between Jackson and Petitioner, Petitioner referred to the victim by the name of Joan, told Jackson that he met her at a bar where he was working and that she came in a few times a week. Shortly after the two met, they engaged in oral sex in the parking lot of the bar, and that they had been seeing one another. T. 431-32. Petitioner went on to say that the victim's marriage was in trouble and it was probably going to end soon. T. 432. According to Jackson, Petitioner told him that the victim was killed around Petitioner's birthday. He had been out drinking and went to Giambra's house afterward where they had an argument about a woman he was living with at the time named Janet. Giambra threatened to tell Janet about her and Petitioner "being together or having an affair or whatever." T. 433-34. "[T]hey had words back and forth and then he grabbed her and he made his hands like, you know - -" in a choking motion. *Id.* Jackson testified that Petitioner told him that "[Giambra's] kid was there, but the kid was playing in another room." T. 434. Petitioner commented that "if he hadn't have been scratched, he probably wouldn't even be in there [jail] with us. And that, you know, he was - - the DNA evidence against him . . . was really nothing because there's other people DNA [sic] all around her." *Id.* Petitioner told Jackson that the crime would be blamed on the victim's husband, and that he told police that he did not know where he was at the time of the murder. He believed his chances of conviction were "slim to none," and if he testified, he would say that every time Giambra was with him, she would run her nails up his back." T. 435-37.

Jackson testified at trial that in exchange for his truthful testimony, he would receive a recommended reduced sentence for a pending sex felony. T. 445. He stated that he had access to television and newspapers in the Holding Center, and some details of the Giambra case were broadcast in the media. T. 515-16. He recalled that although he had seen "quite a bit" of media coverage on Petitioner's case, the only detail he remembered was regarding the DNA being found under the victim's fingernails. T. 467, 516. Jackson acknowledged that he was dishonest in the pretrial *Cardona* hearing, in which he testified that he personally called the tip line posted inside of the Holding Center in February of 2008 in regards to Petitioner. He later testified at trial that he "had somebody else call . . . so [Petitioner] wouldn't suspect me of doing just what I'm doing now." T. 487-88. Jackson stated that he wanted to "correct [his testimony]" and that he didn't think it would matter "who actually called," and that he had made a mistake. T. 489-90.

Deputy Sheriff Joseph Higgins, a telecommunications officer at the Erie County Holding Center, testified that he was assigned to monitor Petitioner's calls, knew Petitioner from high school and spoke to him while he was incarcerated. Dep. Higgins testified that he monitored a call where he overheard Petitioner talking to someone about putting money into Jackson's inmate account. T. 536.

### 4.   Legal Sufficiency

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 364 (1970). A habeas court reviewing a claim for insufficiency of the evidence must determine "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). "[A] petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000). Thus, under *Jackson v. Virginia*, the habeas court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995). On review, the court must consider the evidence in the light most favorable to the prosecution, and draw all inferences in the prosecution's favor. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d at 811. A "federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (*per curiam*).

To sustain a conviction for second degree murder in violation of N.Y. Penal Law § 125.25[1], the jury must have found that petitioner, "[w]ith intent to cause the death of another person, he cause[d] the death of such person or of a third person." N.Y. Penal L. § 125.25[1].[11] A person acts intentionally with respect to a result "when his conscious objective is to cause such result or to engage in such conduct." N.Y. Penal L. § 15.05[1].

---

[11] A habeas court reviewing a sufficiency of the evidence claim first looks to state law to determine the elements of the crime for the petitioner was convicted. *E.g., Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citation omitted).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the prosecution proved intentional murder beyond a reasonable doubt. Although Petitioner claims that the prosecution did not prove its case because it could not establish where and when Petitioner's DNA was deposited on the victim, two witnesses testified that DNA under or on top of the fingernails does not remain in place long, indicating that Petitioner's DNA was deposited on or in the victim's nails within a short period of time before her death. Further, the mere presence of Petitioner's DNA contradicted his statements to Detectives that he did not know where Giambra lived, had never been to her home, and last had contact with her two or three months prior to her death. Of all the foreign DNA found on the victim, only Petitioner's genetic profile was present on the fingernail clippings. Finally, a reasonable juror could infer intent from the testimony of the medical examiner that the victim's death was caused by the assailant using moderate force for a period of up to several minutes, which is inconsistent with a casual encounter as Petitioner now suggests. Viewing this evidence in the light most favorable to the prosecution, as the Court is required to do, there was clearly a valid line of permissible inferences leading to a rational conclusion that Petitioner was guilty of intentionally causing Giambra's death by strangulation.

To the extent Petitioner contends that Jackson's testimony was not credible, it is well-settled that "assessments of . . . the credibility of witnesses are for the jury and not grounds for reversal on appeal." *Maldonado*, 86 F.3d at 35; *see also United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998) (a federal habeas court must "resolve all issues of credibility[ ] in favor of the jury's verdict.") (alteration in original); *Copeland*, 258 F. Supp. 2d at 120 ("[C]redibility determinations are exclusively the domain of the

trier of fact."). In any event, Jackson's testimony was consistent with the balance of the evidence presented at Petitioner's trial, and Jackson testified as to certain information that was not available through the media, such as the argument between Giambra and Petitioner about his then-girlfriend, Janet, and the instance of oral sex between Petitioner and Giambra in the parking lot of the bar where he worked.

Applying the AEDPA standard to Petitioner's insufficiency claim, the Court finds that the Appellate Division did not unreasonably apply *Jackson* to the facts of Petitioner's case.

In the alternative, Petitioner argues that the jury's verdict is against the weight of the evidence. Pet., Attach. at 8-10. Like issues of witness credibility, challenges to the weight of the evidence are not cognizable on habeas review. A weight of the evidence argument is grounded in New York's Criminal Procedure Law § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. L. § 470.15(5). Since such a claim is grounded in state criminal procedure law, it does not present an issue of constitutional magnitude. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Estelle*, 502 U.S. at 67; *McKinnon v. Sup't Great Meadow Corr. Facility*, 422 Fed. Appx. 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is

against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.").

For these reasons, Petitioner's sufficiency and weight of the evidence claims are dismissed.

### F.    Grounds Six and Seven: Article 310 Violations

Petitioner contends that he was deprived of his federal and state constitutional rights to due process and a fair trial when: (1) the trial court failed to address a jury note on the record to counsel before providing a response to the jury in violation of NY. Crim. Proc. L. § 310.30;[12] and (2) the jury rendered a verdict before hearing previously-requested DNA testimony. Pet., Attach. at 11-13.

The Appellate Division found these and his other "remaining contentions" on appeal to be "without merit." *Donahue*, 81 A.D.3d at 1350.[13]

### 1.    Jury Note

As an initial matter, Petitioner's claim set forth in Ground Six of the Petition alleging the trial court's mishandling of a jury note advances only a violation of New York Criminal Procedure Law. In his appellate brief, Petitioner cites to N.Y. Crim. Proc. L. § 310.30 and New York case law applying that section. Resp't Ex. B at 49-51. He has

---

[12]   The note requested that the jurors who took notes sought the return of those notes to assist in deliberation. In addressing that request, the trial court stated that it would "grant that request," and provided a cautionary instruction on the use of notes only as a memory aid. T. 1616.

[13] The state court's rejection of Petitioner's remaining contentions as "without merit," constitutes an adjudication on the merits, and, thus, the AEDPA standard applies to petitioner's remaining claims. *See, e.g. Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) (holding that it will be presumed that a claim was adjudicated on the merits where it was one of the remaining contentions that the Appellate Division stated was "without merit" and that, in such case, the habeas petition should be reviewed under the AEDPA standard rather than *de novo*); *Jenkins v. Artuz*, 294 F.3d 284, 291 (2d Cir. 2002) (holding that a disposition of a claim as being "without merit" constitutes an adjudication on the merits triggering AEDPA deference).

therefore not raised a claim that is cognizable on federal habeas corpus review. *See Cornado v. Bellnier*, No. 10 CIV. 5265, 2012 WL 6644637, at *5 (S.D.N.Y. Sept. 20, 2012), *Report and Recommendation adopted*, No. 10 CIV. 5265, 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012) (collecting cases finding that a violation of § 310.30 does not state a constitutional claim; holding that "[a] claim premised on a violation of New York Criminal Procedure Law Section 310.30 does not allege a violation of a federally protected right."); *see also Shuler v. Artus*, No. 9:15-CV-0399, 2016 WL 698106, at *8 (N.D.N.Y. Feb. 19, 2016) ("There is no corollary requirement to CPL §§ 310.10 and 310.30 under federal law. Shuler's claim is therefore not cognizable on habeas review.")

Moreover, Petitioner's passing reference to the Sixth and Fourteenth Amendments and "due process" in a point heading is not sufficient to exhaust any purported claim of constitutional magnitude arising from the trial court's failure to follow jury note protocol. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."); *see also Bynum, v. Duncan*, No. 02 Civ. 2124, 2003 WL 296563, at *7 (S.D.N.Y. Feb. 12, 2003) ("mere citations are no more than "general appeals" that are insufficient to constitute exhaustion.") Any constitutional claim is therefore unexhausted, and in the absence of a showing of cause and prejudice for the failure to properly raise these claims, they are procedurally defaulted and cannot be litigated here. See *Wainwright*, 433 U.S. at 87.

### 2.   Jury Verdict

Ground Seven of the Petition challenges the trial court's treatment of verdict and the DNA read-back request, although it is unclear which section of Article 310 he seeks

to invoke.[14] Resp't Ex. B at 55-56. As he did on appeal, Petitioner alleges that he was deprived of due process and a fair trial when the jury rendered a verdict before having heard the read-back of all requested testimony, and that the trial court erred in denying his motion for a mistrial on that basis. Pet., Attach. at 13.

During deliberations, the jury submitted multiple notes requesting re-reads of certain witness testimony related to the autopsy and DNA results. T. 1614-23. The parties consented and the trial court agreed to all requests, but on the re-read of the DNA testimony the court reporter inadvertently neglected to read the opinion portion. In an abundance of caution, the trial court proposed, and the parties again agreed, that the entire testimony of the DNA witness be read back including the omitted opinion portion. In the meantime, however, the jury sent a note indicating that they had reached a verdict prior to hearing the read-back of the DNA opinion testimony. T. 1623-25.

Following an in-chambers conference, the trial court proposed, and the parties agreed, that the jury would be given the option to render their verdict or listen to the omitted testimony. That instruction was read to the jury, and the jury responded that they wished to hear the omitted portion of the DNA testimony, which was read back by the court reporter. T. 1625-29.

After the jury left the court room, defense counsel noted that in the read-back, the cross-examination testimony of the prosecution's DNA witness was not included. After several more rounds of proposed instructions and clarification, the trial court and the

---

[14] In Point VIII of his appellate brief, Petitioner alludes to NY. Crim. Proc. L. §§ 310.40 , 310.50, 310.70, and 310.80 without explanation as to how each section applies, followed by a citation to *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). The Court considers the due process claim to be properly exhausted for habeas review.

parties agreed that the jury would again be given the option to listen to a re-read of the cross-examination testimony. T. 1630-33.

While the jury was excused, counsel moved, at Petitioner's request, for a mistrial on the basis that "two separate verdicts" were rendered. T. 1634. The trial court denied the motion on the basis that Petitioner was aware of, and consented to all of the requested read-backs. T. 1639.

The jury declined to hear the cross-examination testimony, and rendered a verdict of guilty. T. 1640.

Under New York law, a trial court may declare a mistrial upon a defendant's motion when "there occurs during the trial an error or legal defect in the proceedings . . . which is prejudicial to the defendant and deprives him of a fair trial." N.Y. Crim. Proc. L. § 280.10[1]. "A habeas petitioner is entitled to relief on a claim based upon a state court's failure to grant a motion for mistrial 'only where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.'" *Toland v. Walsh*, No. 9:04-CV-0773 GLS, 2008 WL 65583, at *20 (N.D.N.Y. Jan. 4, 2008) (quoting *Wilson v. Senkowski*, No. 02CIV.0231, 2003 WL 21031975, at *12-13 (S.D.N.Y. May 7, 2003) (emphasis in original).

The record establishes that the trial court responded to the jury's notes, and at no time refused to provide the jury with the requested information. It attempted to cure the court reporter's omission with the consent of both parties, and repeatedly exercised caution by reading into the record its proposed instructions to the jury, prior to giving the actual instructions, and giving the jury the option of what was read back. Defense counsel consented to the procedures followed by the trial court. Under these

circumstances—where the jury indicated that they had reached a verdict (but did not *render* a verdict) prior to hearing a requested read-back, and subsequently rendered a verdict while declining an additional read-back, is not a basis for habeas relief.

The state Appellate Division holding in *People v. Ortiz*, 265 A.D.2d 431 (2nd Dep't 1999), is instructive here. In *Ortiz*, the jury sent multiple notes to the judge requesting read-backs of testimony. *Id.* at 431. In rejecting the defendant's claim that the trial judge erred by not completing a requested read-back, the appellate court explained, "The Trial Judge never completed the read-back of testimony which was requested in the second note because, after part of the testimony had been read, and a recess taken, the jury sent a note saying that it did not need to hear more." *Id.*

The circumstances presented here are analogous to *Ortiz.* The trial court did not err  when it deferred to the jury's indication that it did not need a read-back of the cross-examination testimony. Like *Ortiz*, "[a]t all times, the Trial Judge indicated his willingness to abide by the wishes of the jurors." *Id.* When the jury sent notes that did not clearly indicate what evidence it wanted to have read back, the judge repeatedly asked for clarification, recited to both parties its proposed instructions, and ultimately acceded to all of the jury's requests with consent of defense counsel and the prosecution. Under the *Ortiz* framework, no error occurred on the present record such to warrant a mistrial, much less one of constitutional magnitude. *See e.g., Williams v. Walker*, No. 00-CV-5912, 2001 WL 1352105 at *3 (E.D.N.Y. Oct. 31, 2001) (habeas court must first determine if ruling was erroneous under state law, and then whether ruling was of a constitutional magnitude).

For these reasons, Petitioner's claims stemming from the trial court's treatment of the jury notes in Grounds Six and Seven are dismissed.

### G.      Ground Eight: *Crawford* Violation

Petitioner contends, as he did on appeal, that his constitutional right of confrontation was violated when the trial court admitted Giambra's autopsy report into evidence as a business record, without the testimony of the medical examiner who prepared the report. Pet., Attach. at 15.

The Appellate Division rejected this contention as being "without merit." *Donahue*, 81 A.D.3d at 1350.

At trial, the prosecution moved the autopsy report into evidence and called Carraugh Nowak, a medical investigator with the Medical Examiner's office to testify as to its contents. T. 928-31. Nowak acknowledged that the report was not authored by her, but by Dr. Fazlollah Loghmanee who had retired in 2000. T. 930, 932. Defense counsel objected to the report for lack of foundation. T. 931. The trial court admitted the autopsy report into evidence as a business record. *Id.* Nowak's testimony was limited to the non-opinion portion of the autopsy report.

Under *Crawford v. Washington*, 541 U.S. 36, 52 (2004)—which was the controlling federal case law at the time of Petitioner's trial in 2007—Petitioner's inability to cross-examine the medical examiner who actually prepared the autopsy did not violate the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 52 (2004); *People v. Freycinet*, 41 A.D.3d 731 (2nd Dep't 2007) (non-opinion portion of autopsy report was nontestimonial in nature, and, thus, was admissible under business records exception to hearsay rule even though doctor who had prepared report was

unavailable); *United States v. Feliz*, 467 F.3d 227, 237 (2d Cir. 2006) (findings in autopsy report prepared by Office of the Chief Medical Examiner of New York qualified as business records, and thus findings in report were not testimonial and were not subject to Confrontation Clause requirements; autopsy reports were reports kept in course of regularly conducted business activity); *see also, e.g, Vega v. Walsh*, 669 F.3d 123, 127-28 (2d Cir. 2012) (upholding denial of habeas petition where state appellate court held non-reporting medical examiner was permitted to testify under *Crawford,* which was the clearly-established law at the time of the petitioner's convictions).

In *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 322 (2009), which was decided at the time of Petitioner's direct appeal, the Supreme Court reaffirmed its general analysis in *Crawford* and clarified that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Id.* The Second Circuit has confirmed that, even after *Melendez–Diaz*, routine autopsy reports such as the one at issue here remain non-testimonial and therefore experts such as Dr. Nowak may rely on them to testify notwithstanding the fact that the autopsy-performer himself is not cross-examined at trial. *United States v. James*, 712 F.3d 79, 89–90, 99 (2d Cir. 2013). As such, when otherwise properly received in evidence, an expert, here Dr. Nowak, is free to testify about it without the need to call the medical examiner who prepared the report. *Id.* at 89-90, 99; *see also Williams v. Illinois*, 132 S. Ct. 2221, 2251-52 (2012) (discussing how autopsy reports

must remain outside the purview of the Confrontation Clause, also citing Fed. R. Evid. 703).

For these reasons, Petitioner's Confrontation Clause claim must fail because the state courts did not contravene *Crawford* or *Melendez–Diaz*. Ground Eight is therefore dismissed.

### H.    Ground Nine: Ineffective Assistance of Counsel

Petitioner claims he was denied the effective assistance of counsel at trial for his attorney's failure to object to prosecutorial misconduct during summation and failure to re-apply to the Appellate Division for a change of venue. Pet., Attach. at 16.[15]

### 1.    Failure to Object to Prosecutorial Misconduct

On appeal, the Fourth Department found Petitioner's contention that his attorney was deficient for failing to object to the prosecutor's remarks on summation to be "without merit." *Donahue*, 81 A.D.3d at 1350.

The standard to be used in determining the effectiveness of counsel is well-established. *See Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judgment of any claim of ineffectiveness must be whether counsel's conduct so undermined the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Judicial scrutiny of counsel's performance must be highly deferential, and reviewing courts should indulge a strong presumption that counsel comported himself properly. *Id.* at 689. Finally, the deficiencies alleged by the defendant must have resulted in prejudice; that is, the

---

[15] Petitioner raises ineffective assistance of counsel as a stand-alone claim in his Petition. On appeal, his claims of counsel's ineffectiveness were woven into other arguments, and the Fourth Department disposed of the claims separately. The Court therefore reviews each determination by the Fourth Department using the AEDPA standard.

defendant must show that "but for" counsel's ineffectiveness there would have been a reasonable probability of a more favorable outcome. *Id.* at 694.

The challenged remarks—such as the prosecutor's reference to defense counsel "encouraging speculation" and creating "theories" as to other individuals who could have been the perpetrator in Giambra's murder—was simply fair comment on the evidence, permissible rhetorical comment, or responsive to defense counsel's summation. *See Natal v. Bennett*, No. 98 CIV. 1872, 1998 WL 841480, at *9 (S.D.N.Y. Dec. 3, 1998) ("Much of the objectionable content was invited by or was in response to the opening summation by the defense.") (citing *Lawn v. United States*, 355 U.S. 339, 359 n.15 (noting that prosecutor's comments did not deprive petitioner of a fair trial since "defense counsel's comments clearly invited the reply."). Moreover, the jurors were instructed on multiple occasions that summations were "not evidence" and that their deliberations should focus on the evidence introduced at trial. T. 1564, 1567.

On appeal, Petitioner took issue in particular with the prosecutor's remark that "[a]ll of these multiple theories have something in common . . . Distraction. They want to distract you from the credible evidence because it is undisputable." T. 1526. The Second Circuit has held, however, "we do not think it improper or excessive, without more, for a prosecutor to criticize defense arguments as merely being attempts to 'grasp at straws' or 'focus on distractions.'" *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012); *see also United States v. Millar*, 79 F.3d 338, 343–344 (2d Cir. 1996) (refusing to reverse a conviction where the prosecution stated in summation that the defense's case was "hog wash" and a "smoke screen," and suggested that defense counsel was trying to "confuse" the members of the jury and "lead them astray."). A review of these and

other remarks made during the course of the prosecutor's summation reveals that none of the comments rose to a level that violated Petitioner's due process rights, could reasonably be said to have influenced the jury's decision, or constitute grounds for rendering Petitioner's trial counsel ineffective for failing to object. Accordingly, defense counsel's performance cannot be said to be deficient under the first prong of the *Strickland* standard. *See Hicks v. Ercole*, 09–CV–2531, 2015 WL 1266800, at *23 (S.D.N.Y. Mar. 18, 2015) ("The failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance."); *see also Johnson v. Rivera*, 07–CV334, 2010 WL 1257923, at *9 (N.D.N.Y. Mar. 25, 2010) ("counsel [does] not render ineffective assistance by failing to make [an objection that would have been overruled as baseless].") (citing *United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir. 1986)).

Because Petitioner has failed to meet the deficient performance component under *Strickland*, the Court need not engage in analysis of the prejudice prong. *Strickland*, 466 U.S. at 697.

## 2.   Failure to Renew Motion for Change of Venue

With regard to defense counsel's failure to renew his change of venue motion to the Fourth Department during jury selection, Petitioner's claim of ineffectiveness must also fail.

On this issue, the Appellate Division held, "[Petitioner] was not deprived of meaningful representation based on defense counsel's failure to renew defendant's motion for a change of venue after defense counsel's request for a stay of the proceedings was denied, inasmuch as defendant failed to establish that such a motion, if made, would have been successful." *Donahue*, 81 A.D.3d at 1349.

Here, defense counsel made several requests to the trial court to stay the proceedings so that he could re-apply for a change of venue, and, in the alternative, moved for a mistrial on six occasions. All were denied. Without a stay of proceedings, such a motion would be impractical and futile. Thus, even if defense counsel had renewed his motion for a change of venue, there was little to no likelihood of success. *See e.g., Solomon v. Comm'r of Corr. Svcs.*, 786 F. Supp.  218, 227 (ineffective assistance of counsel claim based on counsel's failure to renew motion for change of venue denied where counsel conducted extensive *voir dire*, exercised peremptory challenges, voiced his consent to each jury member selected, and decided that change of venue was not necessary). Moreover, "a petitioner cannot prevail on a claim of ineffective assistance of counsel for failure to obtain a change of venue where the jurors selected indicate, on the record, that they are able to decide the case fairly and impartially in the original venue," as was the case here. *See Giordano v. United States*, No. 3:11-CV-9, 2015 WL 7777749, at *29 (D. Conn. Dec. 2, 2015); *see also United States v. Kennedy*, 21 F. Appx. 82, 86 (2d Cir. 2001) (counsel's failure to pursue a motion to change venue not objectively unreasonable where the trial court "had little trouble empaneling a fair and impartial jury.").

The Court cannot find that counsel's failure to make what would have been a futile motion under the circumstances was unreasonable. Further, where there has been no error on the part of trial counsel, the outcome of the proceeding cannot have been affected and the prejudice prong of *Strickland* cannot be met. As such, the Appellate Division's decision was not contrary to or an unreasonable application of federal law.

For these reasons, Petitioner's Ground Nine alleging ineffective assistance of counsel must be dismissed.

## I.        Ground Ten: *Miranda* Violation

Petitioner next claims that he was interrogated in custody without being afforded counsel as required by *Miranda v. Arizona*, 384 U.S. 436 (1966) when he was questioned by detectives at the police station, and that his statements to them were involuntary. Pet., Attach. at 17-18; Resp't Ex. B at 57-61.

The Appellate Division rejected Petitioner's contention on appeal as "without merit." *Donahue*, 81 A.D.3d at 1350.

The relevant facts adduced at the pretrial suppression hearing are as follows: Detectives Aronica and Redmond went to a Kenmore, New York apartment on the morning of September 13, 2007 to interview Petitioner. *Huntley* Hr'g. 17. The detectives, after being invited in by Petitioner's sister, introduced themselves and had a conversation with Petitioner during which he consented to a DNA swab. *Id.* 18-22. Afterward, Det. Aronica took the swab to the Erie County Central Police Services Laboratory for testing. *Id.* 26.

Four days later, on September 17, 2007, Det. Aronica learned the results of the DNA testing and that Petitioner's DNA profile was the same as the genetic material found under Giambra's fingernails. *Id.* 27. That morning, Detectives Aronica and Gugliuzza returned to the Kenmore apartment, where Petitioner answered the door. The detectives asked Petitioner if he would accompany them to police headquarters to look at photos of Giambra to ascertain if they were "talking about the same Joan he knew from the bar," and to give them a sworn statement based on their conversation from four

days earlier. *Id.* Petitioner invited the detectives in, and, after changing his clothes and showering, he accompanied them to police headquarters in the rear of a police car, unrestrained. *Id.* 28.

At the homicide office, Det. Aronica repeated that he wanted to take a statement from Petitioner, to which he replied, "[n]o problem," and that he had "been through this before." *Id.* 29. The statement was taken in question-and-answer format with Det. Aronica asking the questions and Det. Gugliuzza typing Petitioner's answers verbatim. Once complete, Petitioner reviewed the statement, told Det. Aronica that he was literate and had an associate's degree. He initialed each page at the top and bottom and signed the final page in acknowledgement of having read it. The statement lasted 45 minutes, during which time Petitioner was not restrained and was offered and accepted several cups of coffee to drink. He did not indicate that he wished to leave. The detectives did not indicate that Petitioner was a suspect and did not pose any accusatory questions. *See supra* at 29. After Petitioner's statement was taken, he was escorted to another office, where Det. Aronica posted a final question to Petitioner regarding how his DNA got underneath the victim's fingernails. In response, Petitioner indicated he did not wish to say anything further and wanted an attorney, at which point questioning ceased. Until then, Petitioner neither requested counsel nor invoked his right to remain silent. *Id.* 28-35. No *Miranda* warnings were ever administered.

Following the hearing, the trial court found,

> Inasmuch as the record is devoid of any indication that defendant was promised anything, threatened or otherwise coerced into speaking with the police, and in the absence of any custodial interrogation implicating constitutional protections under *Miranda v. Arizona*, 384 U.S. 436 (1966),

> defendant's statements are deemed voluntarily made pursuant to [N.Y. Crim. Proc. L. 60.45] and thus admissible.

Mem. and Order (4/21/08) at 6.

The voluntariness of a confession is "'a legal question requiring independent federal determination.'" *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)). Notwithstanding a federal district court's obligation to make an independent determination of voluntariness, findings of fact underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Nelson*, 121 F.3d at 833–34. Petitioner bears the burden of rebutting those determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). Accordingly, if the material facts were not adequately developed by the state court, or the state court's factual determination is not fairly supported by the record, the district court may set aside the presumption of correctness. *Nelson*, 121 F.3d at 833. When evaluating the voluntariness of a confession, the Court must analyze the totality of the circumstances. *Id.*; *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).

Petitioner has not demonstrated by clear and convincing evidence that the material facts were inadequately developed at the state court hearing or that the record does not fairly support the court's factual determinations. In the absence of such a showing, this Court presumes the correctness of the state court's findings of fact with respect to the circumstances of Petitioner's questioning by detectives. *See Nelson*, 121 F.3d at 833.

Here, Petitioner, who had taken college-level courses, voluntarily invited detectives into his home and spoke with them about Giambra on September 14, and

again on September 17. He willingly accompanied them to the police station on September 17, unrestrained, in the back of their police car. While in the homicide office, Petitioner was not restrained, coerced, threatened, nor promised anything in exchange for his statement, which lasted approximately 45 minutes. He was offered food and beverages. It was not until Petitioner was moved to a second interview room and confronted with the DNA evidence that he invoked his right to counsel. This is sufficient to support the state court's determination that Petitioner's statements were voluntary. *See generally Green*, 850 F.3d at 901–02 (the factors to be considered when assessing voluntariness include (1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials).

To the extent that he now alleges the statement was secured by the "trickery of police" by not disclosing the DNA results until after the written statement was taken is without merit. Petitioner voluntarily submitted to a buccal swab and cooperated with police, knowing that there was a possibility that his DNA could inculpate him. Even assuming, *arguendo*, Petitioner is correct that he was deceived or tricked by detectives, this would still not merit habeas relief as the Supreme Court has made clear that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust" in another. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). The facts remain, and Petitioner does not dispute, that he was not placed under arrest, no charges were filed against him, he was unrestrained during his conversations with police, and he spoke freely in his apartment and again at the police station. The statement was therefore not obtained in violation of Petitioner's Fifth Amendment privilege against self-incrimination.

Further, Petitioner's statements were made in response to permissible investigatory questions while he was not in custody. In *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), the Supreme Court emphasized that "the only relevant inquiry in determining when a person is in 'custody' for purposes of *Miranda* is how a reasonable man in the suspect's position would have understood his situation." The Court has also stated that an individual is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). A determination as to whether an individual is in custody requires "a court [to] examine all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 324 (1994). Under the AEDPA standard, and due to the "difficulty of determining 'custody' for purposes of Miranda . . . unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for *Miranda* purposes was not shown." *Cruz v. Miller*, 255 F.3d 77, 85–86 (2d Cir. 2001).

Although Petitioner urged on appeal that he was considered a suspect on September 17, the day detectives returned to his residence, the state of mind of the police is not at issue in the Fifth Amendment analysis. Resp't Ex. B at 57. *See, e.g., Stansbury,* 511 U.S. at 323 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *accord*, *Nova v. Bartlett*, 63 F. Supp. 2d 449, 453–54 (S.D.N.Y. 1999), *aff'd*, 211 F.3d 705 (2d Cir. 2000) ("Critical to the custody inquiry is whether a

reasonable person in petitioner's position would have objectively felt free to leave."). Simply put, the facts adduced at the suppression hearing do not clearly point to custody simply because Petitioner was considered a suspect or questioned at the police station. *See, e.g., U.S. v. Wallace*, 178 Fed.Appx. 76, 79 (2d Cir. 2006) ("[T]here is no requirement that the *Miranda* warning be given merely because the interview takes place at the police station."); *Gren v. Greiner*, 89 Fed.Appx. 754, 757 (2d Cir. 2004) (state court's decision that a petitioner was not in custody for purposes of *Miranda* was reasonable when he was recovering from injuries, not handcuffed, and asked a limited number of questions); *Maldonado v. Greiner*, No. 01 Civ. 0799, 2003 WL 22435713, at *21 (S.D.N.Y. Oct. 28, 2003) (holding that a petitioner who was not under arrest or required to go to the police precinct, who agreed to accompany the police officers to the precinct and did so unrestrained, who was not told that he could not leave, and who was questioned for 60 to 80 minutes over the course of 13 hours, was not in custody).

Based on the totality of the circumstances presented here, the trial court's determination that Petitioner's challenged statements were admissible, and the Appellate Division's affirmance thereof, was a reasonable application of federal law. This ground of the Petition must therefore be dismissed.

### J.    Ground Eleven: *Massiah* Violation

Petitioner argues that he was denied his rights to counsel, due process, and a fair trial by the admission of inmate Julius Jackson's testimony at his trial. Pet., Attach. at 19.

The Appellate Division rejected this contention on the merits. *Donahue*, 81 A.D.3d at 1350.

Before trial, a hearing pursuant to *People v. Cardona*, 41 N.Y.2d 333, 392 (1977), was held to determine if Jackson had been acting as an agent of the state when Petitioner made certain inculpatory statements to him.

Jackson was arrested for a sex offense in August, 2007, and was housed in the Erie County Holding Center from August 3, 2007 to April 4, 2008. *Cardona* Hr'g. 2, 6, 10. He met Petitioner in late September or early October of 2007, and spoke with him on "several occasions" about Petitioner's murder charge. *Id.* at 7, 13. Jackson was in the cell next to Petitioner's and they spoke regularly between January 22 and February 1, 2008.

On January 22, 2007, Jackson met with Buffalo Police Detectives Aronica and Redmond after they were contacted by another inmate regarding Jackson. *Id.* at 21. Prior to that date, Jackson had never met with law enforcement, and had not contacted the detectives directly. *Id.* at 7. During that meeting, Jackson discussed Petitioner, his charges, and the statements Petitioner had made to him. *Id.* at 8. The detectives advised Jackson "not to pursue" or ask questions of Petitioner, but if Petitioner said anything to him to "take note of it" because it could be helpful to him. *Id.*

On February 1, 2008, Jackson called the Holding Center's tip hotline because he had additional information. *Id.* at 28, 31. Jackson testified that between January 22 and February 1, he did not initiate any conversations with Petitioner and was not asked by the prosecutor or police to "get statements" from Petitioner. *Id.* at 9, 37.

Following the hearing, the trial court found that Jackson was credible and acted on his own initiative with no direction from law enforcement. *Id.* at 41.  Accordingly, the

trial court concluded that Jackson was not an agent of the prosecution and could testify. *Id.*

In New York, a *Cardona* hearing is the functional equivalent of a hearing held pursuant to *Massiah v. United States*, 377 U.S. 201 (1964). In *Massiah*, the Supreme Court held that once a defendant's Sixth Amendment right to counsel attaches, the government may not "deliberately elicit[ ]" inculpatory information from the defendant "in the absence of counsel," and explicitly applied this prohibition to the use of undercover agents or government informants for the purposes of obtaining such statements. 377 U.S. at 206–07. The *Massiah* rule "covers only those statements obtained as a result of an intentional effort on the part of the government, so information gotten before the inmates become agents/informants is not protected by the rule." *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996).

The trial court determined that "the inmate witness informer acted on his own initiative with no instigation of direction from law enforcement personnel who, in fact, instructed the informer not to pursue the defendant for the purpose of obtaining information and thus did not act as an agent of the police or prosecution." *Cardona* Hr'g. 41. These factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and can only be overturned upon a showing of clear and convincing evidence by Petitioner. Petitioner's assertion that the witnesses were not credible is plainly insufficient to overcome § 2254(e)(1)'s presumption. In light of the trial court's unreviewable factual findings, this Court cannot say that Petitioner has proven by clear and convincing evidence that Jackson's statements were "obtained as a result of an intentional effort on the part of the government." *Stevens*, 83 F.3d at 64. Therefore,

Jackson's testimony did not run afoul of the *Massiah* rule and the state courts did not unreasonably apply federal law in this regard.

### K.      Ground Twelve: Harsh and Excessive Sentence

Petitioner contends that his sentence of 25 years to life in prison was unduly harsh, excessive, and severe. Pet., Attach. at 20. Petitioner's sentence imposed by the trial court was within the statutory range permitted under New York law, *see* N.Y. Penal L. §§ 70.00, 125.25, and as such, is not reviewable by this Court. "[W]hen a sentence is within [the range of years prescribed by law], a claim of excessive punishment does not present a constitutional question necessary for habeas corpus reversal." *Underwood v. Kelly*, 692 F. Supp.  146, 152 (E.D.N.Y. 1988), *aff'd* 875 F.2d 857 (2d Cir. 1989); *see also White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."). Petitioner's claim challenging his sentence must be dismissed.

### Conclusion

For the reasons stated above, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of the Court is requested to close this case.

**IT IS SO ORDERED.**

*/s/ Michael J. Roemer*
MICHAEL J. ROEMER
United States Magistrate Judge

Dated:       September 27, 2016
             Buffalo, New York